MEMORANDUM. On the 18th day of January, 1853, the Hon. Richard Fletcher resigned the office of justice of this court, which he had held since October 24th, 1848.

On the 28th day of January, 1853, the Hon. Benjamin F. Thomas of Worcester, who had been appointed a justice of this court, in place of the Hon. Richard Fletcher, was sworn into office, and on the 14th of February following, took his seat on the bench, at Boston.

## JOHN RAND & another vs. OZIAS H. MATHER.

An agreement, which is void in part under the statute of frauds, is not necessarily void *in toto*.

A. contracted to do certain work for B. but suspended labor because of B.'s failure to pay according to the contract. C. told A. to finish the contract, and he would pay him in full. A. did so, relying upon C.'s promise. *Held*, that A. could recover of C. for the work performed after such promise, but not for that before.

*Loomis* v. *Newhall*, 15 Pick. 159, in part overruled.

VOL. XI.                    1

ASSUMPSIT to recover for work and materials in painting certain houses for the defendant. The writ contained the common counts, and an account annexed, specifying the work and materials, amounting to $179. Plea, the general issue.

At the trial in the court of common pleas, it appeared that the defendant being the owner of certain lots of land, made a written contract with John Whiston, by which Whiston was to build houses on these lots, and to receive a deed of them, when finished, on paying for the land at a certain rate, and repaying the defendant such sums as he should advance. The plaintiffs made a written contract with Whiston to do the painting at a certain rate per yard, to be paid as the work progressed. The plaintiffs worked until about $45 were due them, of which Whiston had paid them $15, when they refused to work any longer, because they had not been paid, and were doubtful whether they should get their pay, and discontinued their work for about six weeks.

John Whiston testified as follows : " I failed to perform my contract with the plaintiffs by not paying them. I told the defendant that the plaintiffs had left off work. He asked the cause, and I told him that Rand had not funds to buy stock, and was afraid of his pay, and, therefore, stopped work. He asked how much I had paid him, and I told, and how much was due. Defendant said he was foolish, and ought to drive on with his work. I told him that he would not go on with his work, unless he got his pay. Afterwards I was present at an interview between Rand and defendant. Rand said ; ' Doctor, I am hard up. I want some money. I cannot go on without pay ! ' Defendant replied, ' that he was a foolish man,—to drive on with the work, and he and every other man should have every dollar that was owing to him.' About six weeks before this, I took the poor debtors' oath by defendant's advice. Afterwards I went on, but I cannot say on the same terms. I rather think not, as the doctor had been talking with the men. I went on under the same contract. I made no new one. At the time of the foregoing conversation, defendant owed me $500. I mean that he was bound to advance me that sum, to defray the expense of the work as it went on. He had

agreed to help me with money to erect the houses, so far as the progress of the building would justify, and I was to give him notes. This was a part of our contract. Afterwards I heard defendant say to them, ' Go on, and I will see you paid.' And afterwards Rand said to me, ' I am all right—the doctor will satisfy me—I shall go ahead.' He said : ' John, I've seen the doctor. He will satisfy me for all I have done, and I will now go on with a good heart and finish the remainder. I shall get my pay every cent : and accordingly he went on and finished the work. The houses still belong to defendant. He has never conveyed them to me, and is still in debt to me, as I understand it. After the defendant spoke to the plaintiffs, I did not consider myself liable to them for either the $30 then due them, or for what they were to do. I considered the defendant liable for both. I did not employ them. I had no other reason for not considering myself liable, than the statement I have before given, of what was said by Rand and by defendant. I paid Rand nothing after this.

" After the plaintiffs resumed their work, defendant ordered and paid for some materials that were used upon the houses. These amounts are included in notes I gave him, when the houses were finished, for advances. Since ·the houses ·were finished, I have collected rents for them, and paid them over to defendant. I had made a written assignment to him of these rents, at his request, to keep him from being trusteed. About the time plaintiffs' work was done, Rand presented me a bill, (corresponding with the account annexed to this writ.) I made no objection to it, as the work had been surveyed, and the amount was correct, and should have paid it, if I had money enough for all, from the party who paid me. I was present when Rand presented the same bill to defendant, and asked him if he would settle it. Defendant did not say whether or no he was obliged to pay it. I do not know certainly to whom he presented the bill first, but think the defendant."

William Whiston testified as follows : " I worked on the buildings by the day. Most of the men, including the plaintiffs, left off. I told the defendant of this, and the reason, and

he told me to tell them to go on, and he would guarantee they should all be paid, every dollar that was owing them. I told the plaintiffs of it. A man offered to buy one of the houses for $150 less than defendant's price. The workmen, including the plaintiffs, signed a paper, agreeing to give in each a certain sum upon this work to make up the deficiency, and I reported this to the defendant. The defendant refused, and told me he would not be so mean as to take the money from the men; and they should have every dollar of their money."

John Wright testified thus: "I worked on the building. I left off when plaintiffs and others did. The defendant told me to go on, and stay till the work was finished, and that I and every other man should receive every dollar that was due us. He said he might not pay me as fast as I expected to be paid, because he had lost money by an absconding debtor."

Thomas Connor also testified: "I worked on the buildings. I stopped when the plaintiffs and others did. I went to the defendant. Defendant told me that Rand had been there, and that he had satisfied him. I asked him how? He replied: 'I told him to go on and do his work according to his agreement, and I would pay him.'" Here the plaintiffs rested their case.

The defendant contended that if any contract was proved, it was within the statute of frauds. Thereupon, *Hoar*, J. instructed the jury that the evidence offered would not authorize a verdict for the plaintiffs, and a verdict was accordingly taken for the defendant. To this instruction the plaintiffs excepted.

*R. H. Dana*, Jr. for the plaintiffs.

*H. C. Hutchins & A. Wheeler*, for the defendant.

METCALF, J. The instruction given to the jury, that the evidence offered by the plaintiffs would not authorize the finding of a verdict for them, must have proceeded upon the ground that an agreement, which is void in part by the statute of frauds, is void *in toto*. And so it was decided in *Loomis* v. *Newhall*, 15 Pick. 159, on the authority of *Lord Lexington* v. *Clarke*, 2 Vent. 223, and *Chater* v. *Beckett*, 7 T. R. 201. The

question therefore is, whether that decision was right. And we are all of opinion that it was wrong and must be over-ruled. The grounds of this opinion are briefly stated in *Irvine* v. *Stone*, 6 Cush. 508. And though what was there said, on this point, was not essential to the decision of that case, and would have been omitted or modified, if *Loomis* v. *Newhall* had been then remembered, yet it was the result of a considerate examination of the principles which are uniformly applied in analogous cases, and of the latest adjudications on the precise point now in judgment. A renewed examination of those principles and adjudications has confirmed the opinion then expressed.

It is unnecessary to refer to any adjudged case besides that of *Wood* v. *Benson*, 2 Crompt. & Jerv. 94, and 2 Tyrw. 93, which is not distinguishable from the case before us. In that case, the previous decisions in 2 Vent. 223, and 7 T. R. 201, and *Thomas* v. *Williams*, 10 Barn. & Cres. 664, were all considered by the court of exchequer, and were held to have been rightly decided upon the ground of a variance between the declaration and the proof. In the first and third of those cases, there was only a single count in the declaration, namely, a special count setting forth the whole agreement alleged to have been made by the defendant. In the language of Bayley, B. (2 Crompt. & Jerv. 100,) " the declaration in each of those cases stated the entire promise, as well that part which was void, as that which was good. I think, therefore, that these cases are to be supported on the principle of failure of proof of the contract stated in the declaration; but that they do not establish that if you can separate the good part from the bad, you may not enforce such part of the contract as is good." In the case in 7 T. R. 201, there was, in addition to the special count on the entire promise, a count for money paid by the plaintiff to the use of the defendant. But it was held, without reference to the statute of frauds, that the evidence did not support that count. Lord Lyndhurst said (2 Crompt. & Jerv. 98, 99) : " The case of *Thomas* v. *Williams* may, as it appears to me, be supported. Part of the contract in that case was void by the statute of frauds. The declaration

1*

stated the entire contract, including that part of it which was void; and therefore the contract, as stated in the declaration, was not proved. The same observation applies to *Lexington* v. *Clarke,* and *Chater* v. *Beckett;* and I have no disposition to complain of those decisions, because in none of those cases does there appear to have been any count upon which the plaintiff could recover."

In *Wood* v. *Benson* there was not only a special count on the entire agreement, but also a count for goods sold and delivered. And it was decided that, on this last count, the plaintiff was entitled to recover for the goods sold and delivered after the defendant's promise to pay for them. In the case at bar, there is no special count on the defendant's agreement, but the general *indebitatus* counts only are inserted in the declaration. And a plaintiff may recover on such counts after the terms of a special agreement are performed by him. This has been the settled law ever since the decision in *Gordon* v. *Martin,* Fitzg. 302.

If there had not been a general as well as a special count, in *Loomis* v. *Newhall,* the decision in that case might have been sustained by the authorities on which it was made. There would have been a variance or failure of proof. But as there was a general count, the case was erroneously decided.

The analogies of the law confirm our views of this case, and the decision in *Wood* v. *Benson.*

In early times it was held that an award, if bad in part, was wholly bad. But it has long been settled, on satisfactory grounds, that the general validity of an award is not impaired, though some things, which the arbitrator appoints to be done, are impossible, unreasonable, or unlawful, unless, " by the particular defect, a mutuality of interest and advantage, appearing evidently to have been intended by the arbitrator to be given, is destroyed; or where the general substance of the award and the real justice of the case are affected." Caldwell on Arb. (1st Amer. ed.) 120; *Hartnell* v. *Hill,* Forrest, 79, 80.

In contracts which are not affected by statute provisions,

Rand & another *v.* Mather.

the doctrine always has been, as it was announced by Hutton, J. in *Bishop of Chester* v. *Freeland*, Ley, 79, to wit, "at the common law, when a good thing and a void thing are put together in one selfsame grant, the same law shall make such construction that the grant shall be good for that which is good, and void for that which is void." See *Newman* v. *Newman*, 4 M. & S. 66; *Bank of Australasia* v. *Breillat*, 6 E. F. Moore, 152.

It is said in many books that if any part of an agreement is contrary to a statute, the whole is void, though it is otherwise where part only is contrary to the rules of the common law; that "a statute is like a tyrant; where he comes, he makes all void." But this never was true of statutes generally. Twisden, J. in *Maleverer* v. *Redshaw*, 1 Mod. 35, stated that he had heard Lord Hobart say that the *St.* 23 H. 6, was "like a tyrant," &c. That statute prescribed the form of a bail bond, and made, in express terms, "any obligation, in other form, void." And in *Norton* v. *Simmes*, Hob. 14, (to which case Twisden, J. doubtless referred,) it was resolved by Lord Hobart and his associates that "if a sheriff will take a bond for a point against *that law*," (*St.* 23 H. 6,) "and also for a due debt, the whole bond is void; for the letter of *the* statute is so; for a statute is a strict law. But the common law doth divide according to common reason, and having made that void, that is against law, lets the rest stand." See *Kerrison* v. *Cole*, 8 East, 236, 237.

On principle, and according to numerous modern adjudications, the true doctrine is this: If any part of an agreement is valid, it will avail *pro tanto*, though another part of it may be prohibited by statute; provided the statute does not, either expressly or by necessary implication, render the whole void; and provided, furthermore, that the sound part can be separated from the unsound, and be enforced without injustice to the defendant. See opinion of Gibbs, C. J. in *Doe* v. *Pitcher*, 6 Taunt. 369; *Mouys* v. *Leake*, 8 T. R. 411; *Gaskell* v. *King*, 11 East, 165; *Wigg* v. *Shuttleworth*, 13 East, 87; *Howe* v. *Synge*, 15 East, 440; *Greenwood* v. *Bishop of London*, 5 Taunt. 727. In the application of this doctrine, Chancellor Kent

says: " If the part which is good depends upon that which is bad, the whole is void; and so I take the rule to be, if any part of the consideration be *malum in se*, or the good and the void consideration be so mixed, or the contract so entire that there can be no apportionment." 2 Kent Com. (6th ed.) 467. The application of this doctrine to cases affected by the statute of frauds, will be found in *Mayfield* v. *Wadsley*, 3 Barn. & Cres. 357; *Ex parte Littlejohn*, 3 Mont. Deac. & De Gex, 182; *Wood* v. *Benson*, before cited—where one part of the agreement was held to be separable from the other; and in *Cooke* v. *Tombs*, 2 Anst. 420; *Lea* v. *Barber*, 2 Anst. 425, *note;* *Mechelen* v. *Wallace*, 7 Adolph. & Ellis, 49; *Vaughan* v. *Hancock*, 3 Man. Grang. & Scott, 766; *Irvine* v. *Stone*, 6 Cush. 508—where it was held that the different parts of the agreement could not be separated. *New trial ordered*